UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZADE JENKINS,<br><br>    Plaintiff<br><br>              v.<br><br>CITY OF EASTHAMPTION;<br>EASTHAMPTION PUBLIC SCHOOL DISTRICT;<br>and KEVIN BURKE,<br><br>    Defendants. | **Case No:** |

# COMPLAINT AND JURY DEMAND

## INTRODUCTION

1. The City of Easthampton, the Easthampton Public School District ("EPSD") and Easthampton High School Principal Kevin Burke ("Burke") (together, "Defendants") caused and are liable for harm suffered by Plaintiff Zade Jenkins while he was a student at Easthampton High School ("EHS"). Defendants fostered an environment of pervasive racial discrimination and harassment, and were responsible for other violations of Plaintiff's civil rights as detailed herein.

## PARTIES

2. Plaintiff Zade Jenkins is an individual residing in Easthampton, Massachusetts.

3. Defendant City of Easthampton is a municipal corporation duly organized and existing under the laws of the Commonwealth of Massachusetts.

4. Defendant Easthampton Public School District is a local administrative district under the Massachusetts Department of Elementary and Secondary Education and is located in Easthampton, MA.

5. Defendant Kevin Burke is an individual residing in Southampton, MA.

## JURISDICTION AND VENUE

6. This action is brought pursuant to 42 U.S.C. § 2000d and 42 U.S.C. § 1988.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.  This Court also has pendent jurisdiction under 28 U.S.C. § 1367 over the related claims pursuant to state law.

7. Venue is proper in this Court under 28 U.S.C. § 1391 because the events giving rise to this civil action occurred in this judicial district.

8. This Court has personal jurisdiction over all Defendants because Kevin Burke resides in Southampton in the Commonwealth of Massachusetts and was at the time of the facts herein employed by the EPSD, an administrative district within the Commonwealth of Massachusetts.  Furthermore, the City of Easthampton is a municipality within the Commonwealth.

## FACTUAL ALLEGATIONS

9. Zade attended Easthampton High School from 2014 to 2018.

10. While at EHS, Zade excelled in sports and maintained satisfactory grades.  Until the incident giving rise to this complaint, Zade was never involved with the criminal justice system.

11. At school, Zade, a student of color, regularly witnessed and was the victim of racist comments and innuendos and was subject to multiple incidents of racial discrimination

and harassment. These behaviors escalated during Donald Trump's presidential campaign and election in fall 2016 and after.

12. Anonymous acts of racism were also prevalent. Racist graffiti was not uncommon. For example, a poster depicting a multicultural group, including a woman in a hijab, was defaced and not removed or corrected by staff.

13. EHS also failed to address flagrant displays of racist paraphernalia and posturing. For example, in Spring 2017, a student flew a full-sized confederate flag in the parking lot for an entire afternoon without any interference from EHS staff, teachers or administrators. The incident was eventually addressed but only after complaints from *parents*. Another student, in Spring 2017, wore a jacket entirely covered in a bright, huge image of a confederate flag. He was able to wear it all day on more than one occasion with no objection from teachers or administrators. Again, the student was only addressed and asked to remove the jacket after parents intervened.

14. In addition, the EPSD has acknowledged that overt acts of racism were prevalent in the larger City community during the 2016-2017 school year and had an impact on students at EHS. For example, racist graffiti was repeatedly painted on rocks at the top of Mt. Tom and dozens of pro-diversity "Good Neighbor" and "Black Lives Matter" lawn signs were stolen during a contentious public debate on Easthampton becoming a "sanctuary city."

15. During the presidential campaign of Donald Trump in Fall 2016, an adult resident of Easthampton managed to enter EHS grounds and made racist and threatening comments to a student of color.

16. This racially hostile environment has been well documented by the Massachusetts Office of the Attorney General ("OAG") in a report dated August 25, 2017, as will be discussed in further detail below.

17. As further documented by the OAG, Zade in particular was the victim of Principal Burke and the EPSD's administration of a racially discriminatory disciplinary policy that led to Zade's arrest and prosecution for a racially motivated schoolyard altercation.

**SCHOOLYARD ALTERCATION IN MARCH 2017**

18. On March 29, 2017, in this hostile environment of administrative neglect and racial discrimination, EHS Principal Kevin Burke received information that three students of color had hit a white student after school on the grounds of EHS. Zade was identified as one of the students involved.

19. The white student involved was the son of the School Resource Officer who was also a member of the Easthampton Police Department. This student had been a perpetrator of acts of racial hostility inside and outside of the school and was regarded as an instigator of hostile interactions with students of color.

20. For example, shortly after Donald Trump was elected President in November 2016, the Officer's son was seen parading around the school holding a Trump/Pence campaign sign. He was witnessed to have approached a student of color whom he taunted by holding the banner in the student of color's face as he jeered the name "TRUMP!"

21. Just prior to the schoolyard altercation, the Officer's son had sent a series of racist Snapchat messages to a former EHS student. These messages were posted to Facebook and were viewed by many students in the EHS community.

4

22. It was alleged that Zade joined his friend and related plaintiff Josh Brown at a schoolyard "challenge" set up to settle the disputes students of color had with the Officer's son.

23. Having received the "challenge", the white student voluntarily appeared at the designated location in the EHS parking lot.

24. Word of the "challenge" had spread around school and the incident was attended by many other students.

25. As everyone assembled, Zade and two other students of color were alleged to have each thrown a punch and hit the white student.

26. Students witnessing the event, however, were allegedly laughing and even cheering the event.

27. After learning of the schoolyard altercation on March 29, 2017, instead of making a routine investigation of the incident and applying the usual disciplinary measures generally applied to similar incidents involving white students, Principal Burke took the extraordinary step of referring the incident directly to the Easthampton Police Department on March 29, 2017.

28. According to the police narrative of the event, on the day of the incident, rather than let the police department undertake an investigation in the ordinary course, without any warrant, Principal Burke conferred with Officer Rick Rogalski and provided Officer Rogalski with personal identifying information, including Zade's home address, to aid in his seizure and arrest.

29. Officer Rogalski, in his capacity as a police officer, then used this illegally obtained information to effect Plaintiff's arrest.[1]

30. According to Officer Rogalski's narrative of the incident, Principal Burke approached Officer Rogalski and insisted on arrest and prosecution for a crime, despite the protestations of the white student, the alleged victim of the incident.

31. In addition to the extremely troubling racist implications of their actions, Principal Burke and Officer Rogalski's actions reflected a clear conflict of interest, since their fellow administrator and School Resource Officer was the father of the white student involved in the incident.

32. Principal Burke and Officer Rogalski's actions resulted in Zade's prosecution by the Northwestern District Attorney's Office in Hampshire County Juvenile Court.

33. Worse still, the EPSD and the Police Department decided to make Officer Rogalski the School Resource Officer, despite his involvement in this incident.

34. Officer Rogalski was first assigned to be the interim SRO in May 2017, after the previous Officer (obviously conflicted) stepped down.  Zade's mother, Mindy Jenkins, wrote to Principal Burke and the Superintendent by email dated May 24, 2017 and urged them to reconsider the interim appointment and to give consideration to how painful it would be for the boys Principal Burke had arrested to see one of the arresting officers when they walked into school every day.

35. Ms. Jenkins pleas were ignored.

---

[1] The Massachusetts Office of the Attorney General ("OAG") specifically cited Principal Burke's mishandling of this matter as an area of concern related to the disciplinary decisions for students of color.  See OAG Report and Memorandum of Agreement, attached here as Exhibit 1, at pp. 7-8.

36. In August 2017, at a School Committee meeting in Easthampton, Police Chief Alberti was questioned again by parents on the decision to make Officer Rogalski the permanent School Resource Officer.

37. Chief Alberti breezily suggested that Zade and Officer Rogalski were in each other's "good graces" and were, as he understood it, high fiving each other on a regular basis.

38. Worse, Chief Alberti refuted Ms. Jenkins' and other parents' concerns about the potentially harmful role of a police officer within the schools by publicly endorsing the National Association of School Resource Officers' dubious position that SRO's play no role in the school to prison pipeline.  He made this statement, of course, within months of his police department being directly involved in the racially discriminatory disciplinary decision to arrest and prosecute Zade and related plaintiff Josh Brown.

39. The Chief's comments highlighted the racial discrimination inherent in the educational policies of the City and the EPSD.

40. Moreover, the City, the EPSD and Principal Burke showed their utter disregard for the needs of Zade and the other students of color by ignoring Ms. Jenkins' concerns and ultimately coordinating the permanent appointment of Officer Rogalski to the SRO position.

41. This entire process was profoundly upsetting for Zade.  In addition to the usual stress and fear that criminal prosecution brings to any accused, Zade was facing an increasingly hostile environment at school.  The case was widely publicized and was the subject of much discussion between students and faculty.  The environment at EHS became so uncomfortable and frightening to Zade that he ultimately left school a month early in the 2016-17 academic year because he was unable to cope with the stress of being at EHS.

42. Upon his return to EHS in Fall 2017, Zade joined the football team, where despite his involvement in the investigation and arrest of Zade and the other students of color, Officer Rogalski remained a coach.

43. Weeks into the Fall season, as the EHS football team coach, Rogalski began holding team meetings at the Easthampton Police Station to view videos for training purposes.

44. Wanting to be a good member of the EHS football team, Zade tried to overcome the trauma of returning to the station in order to join the team for the viewings. After attending the first such meeting, though, Zade found it impossible to return.

45. Zade continued to play football that season and even rejoined the basketball team for the Winter season, but his entire senior year was clouded by the trauma of Principal Burke's actions and the subsequent decision of the EPSD and the City's Police Department to keep Principal Burke and Officer Rogalski in positions of power while Zade was still in attendance at the school.

46. The decision to seek criminal prosecution solely for Zade and the other students of color involved in the March 29th incident was done without any significant investigation or deliberation, when such a decision would clearly not have been made if the accused were white.

47. Following Zade's arrest and prosecution, Easthampton High School continued to mishandle bias-related incidents.

48. A group of white students began to affix the Confederate Flag to vehicles driven into the parking lot in Spring 2017.

49. Zade witnessed these displays.

50. In fact, on one occasion that Spring, a student wearing a confederate flag shirt approached Zade in the cafeteria to display the flag to him.

51. Additionally, a series of Instagram postings from accounts called "Make.EHS.Great.Again" and "Make.EHS.Great.Again.Part2" were directed to and targeted students who had expressed support for racial sensitivity and opposition to the racist symbol of the confederate flag, which was displayed in hostile reaction by several white students.

52. Not a single white student responsible for any of the racist attacks and innuendos of violence displayed at school or on Instagram in the 2016-2017 school year appears to have been referred for criminal prosecution.

## **THE OAG INVESTIGATION AND REPORT**

53. While involvement in a schoolyard fight would be a poor choice on anyone's part, it is, unfortunately, a common occurrence in a high school. The extreme response that Principle Burke and the EHS administration had to this particular event, however, was highly unusual. So unusual, in fact, that it sparked outrage and complaints from parents, community members and civil rights activists who complained that the ESPD and EHS had not properly handled what was clearly a bias related incident.

54. These complaints reached the Massachusetts Office of the Attorney General. The severity and volume of the allegations prompted the OAG to conduct an investigation into EHS's treatment of students of color, as well as their efforts to combat what was clearly a racially hostile environment festering in the school.

55. Starting in May of 2017, the OAG began to investigate not only the specific incident described above, but a string of other incidents that were brought to its attention during

the course of interviews of EHS faculty and administration and the review of documents and data provided by EHS, EPSD, the Easthampton Police Department and the Department of Elementary and Secondary Education.

56. On August 25, 2017, the OAG produced its report, which found "a number of significant concerns" that required immediate attention regarding bias related problems in the EHS environment, as well as "significant racial and ethnic disparities in EHS's administration of student discipline." See OAG Report and Memorandum of Agreement, (the "OAG Report") attached here as Exhibit 1, at pp. 2-3.

57. The OAG has cited the EHS administration for not forcefully responding to or disciplining the creator(s) of these racist attacks described above. Id. at pp. 5-6.

58. Moreover, as the OAG Report specifically found, Principal Burke and the EHS administration "treated physical incidents involving white students less severely than incidents involving students of color." Id. at 6.

59. In fact, according to the OAG, Principal Burke was three to four time more likely to more severely punish a student of color than a white student for the same incident. Id.

60. As the OAG indicated, in addressing and reporting on infractions committed by white students, "EHS appears to have used 'Other', rather than a specific Incident Type (e.g., 'Assault'), to indicate that an infraction was complicated and required a special disciplinary response." Id.

61. This selective application of rules and disciplinary decisions resulted in milder discipline for white students. Id. at pp. 6-7.

62. Zade's high school experience was marred by a pervasive environment of racial hostility that festered due to the EHS administration's utter disregard for his needs and those of

other students of color, as well as the administration's absolute failure to protect students of color.

63. Zade, a once engaged and friendly young person, was stripped of his innocence when he was treated like a violent criminal and prosecuted for a schoolyard conflict that stemmed from an environment of racial hostility that grew out of the Defendants' neglect.

64. Not only was Principal Kevin Burke, the EPSD, and the City of Easthampton unable to curtail the racial hostility, they exacerbated it through significant racial and ethnic disparities in EHS's administration of student discipline.

65. Following Zade's arrest, the Defendants created an even more directly hostile environment for Zade by making Officer Rogalski the School Resource Officer and allowing him to coach Zade's football team and use the police station as a meeting place for the team.

### COUNT I
### RACIAL DISCRIMINATION UNDER A FEDERALLY FUNDED PROGRAM
### PURSUANT TO 42 U.S.C. § 2000d
### (All Defendants)

66. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

67. As a student at EHS, Zade was subjected to a pattern of racial discrimination in his education, including but not limited to, a racially hostile environment that went unchecked and the racial disparity in administration of school discipline as described above.

68. As determined by the OAG, it was the practice of the EPSD and Kevin Burke to engage in the actions and omissions that led to this racial discrimination.

69. The EPSD, EHS and/or the City of Easthampton, receives Federal financial assistance.

70. Accordingly, Plaintiff was denied the benefits of and subjected to racial discrimination under a program of public education that received Federal financial assistance in violation of 42 USC § 2000d.

71. As such, Plaintiff is entitled to compensation for his damages, in an amount to be determined at trial, in addition to all reasonable costs and attorneys' fees under 42 U.S.C. § 1988(b).

**COUNT II**
**VIOLATIONS OF CIVIL RIGHTS**
**UNDER M.G.L. c. 76 § 5 and M.G.L. c. 12 § 11I**
**(All Defendants)**

72. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

73. As a student in the Commonwealth of Massachusetts, Zade was entitled to a public education free from racial discrimination under M.G.L. c. 76 § 5.

74. As described above, and as specifically cited by the Office of the Attorney General, EHS, the EPSD, the City of Easthampton (through its police force) and Principal Kevin Burke engaged in a pattern of racial discrimination against Zade and other students of color in the administration of a racially disparate disciplinary policy in direct violation of M.G.L. c. 76 § 5.

75. Specifically, Zade's right to a public education free of racial discrimination was interfered with by coercion, when Principal Burke, personally and on behalf of EPSD, in cooperation with the City, acted to have Zade arrested and prosecuted as described above.

76. Accordingly, Plaintiff has been denied the enjoyment of his rights secured by the constitution and laws of the Commonwealth through coercion in violation of M.G.L. c. 12 § 11H.

77. As such Plaintiff is entitled to an award of compensatory money damages, and other equitable relief, in amounts to be determined at trial, as well as reasonable costs and attorneys' fees under M.G.L. c. 12 § 11I.

## COUNT III
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (All Defendants)

78. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

79. By deciding to refer Zade for arrest following a racially charged schoolyard incident when a white student would almost certainly not have been treated the same way, the EPSD and Kevin Burke breached their duty of care to Zade, and set in motion a series of events that led to Zade's arrest and prosecution.

80. As a coach at EHS, Officer Rogalski owed Zade a similar duty of care.

81. By working together to acquire personal confidential information from school records to effect Zade's arrest, Officer Rogalski, Burke, EPSD and the City, jointly and in concert, engaged in negligent conduct that breached their duty of care to Zade.

82. By effecting the arrest leading to criminal prosecution, Officer Rogalski, Burke, the EPSD and the City, jointly and in concert, engaged in negligent conduct that breached their duty of care to Zade.

83. By allowing an environment of racial hostility to fester and failing to take adequate steps to correct it, Burke and the EPSD engaged in negligent conduct that breached their duty of care to Zade.

84. By appointing Officer Rogalski as the SRO and failing to properly supervise his actions as a coach of Zade's football team, where he used the Police Station that was the scene of

Zade's discriminatory arrest for coaching purposes, the EPSD, Burke, and the City of Easthampton engaged in negligent conduct that breached their duty of care to Zade.

85. As a result of all Defendants' actions described herein, Plaintiff suffered emotional distress.

86. Any reasonable person in Plaintiff's situation would have suffered emotional distress.

87. The Defendants' negligence proximately cause Plaintiff's emotional distress, including but not limited to anxiety, loss of joy in life, fear, stress and loss of sleep.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

88. Plaintiff restates the allegations set forth above and incorporates each as if fully set forth herein.

89. By referring Zade for arrest and criminal prosecution as described above, Burke, the EPSD, and the City (through the cooperation of Officer Rogalski and the Police Department) engaged, jointly and in concert, in conduct that was extreme, outrageous, and beyond all possible bounds of decency.

90. By appointing Officer Rogalski as SRO and then allowing him to coach Zade's football team in the manner described above, the EPSD, Burke, and the City engaged jointly and in concert, in conduct that was extreme, outrageous and beyond all possible bounds of decency.

91. All Defendants knew or should have known that arresting Zade and delivering him to the Courts for criminal prosecution would likely cause emotional distress.

92. Likewise, all Defendants knew or should have known that putting Officer Rogalski in his position as the SRO and allowing him to continue coaching in the manner described herein would likely cause emotional distress for Zade.

93. Defendants' extreme and outrageous conduct proximately caused Plaintiff's emotional distress.

94. Plaintiff's emotional distress has been, and continues to be, severe, and any reasonable person would have suffered such distress under the circumstances, including but not limited to anxiety, loss of joy in life, fear, stress and loss of sleep.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor:

(a) For compensatory and emotional damages in an amount to be determined at trial;
(b) For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and M.G.L. c. 12 § 11I.
(c) And for such other and further relief as this Honorable Court shall deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 16, 2019

        Respectfully submitted,

        ZADE JENKINS
        By his Counsel,

        /s/ Peter T. Lane
        Peter T. Lane, Esq., BBO #673748
        Mae Stiles, Esq., BBO #569537
        FIERST BLOOMBERG OHM LLP
        64 Gothic Street, Suite 4
        Northampton, MA 01060
        413-727-8300
        lane@fierstbloomberg.com
        stiles@fierstbloomberg.com