# EXHIBIT 1



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
CENTRAL MASSACHUSETTS DIVISION
10 MECHANIC STREET – SUITE 301
WORCESTER, MASSACHUSETTS 01608

MAURA HEALEY
ATTORNEY GENERAL

TEL: (508) 792-7600
FAX: (508) 795-1991
www.mass.gov/ago

August 25, 2017

By Email and First Class Mail

Debora Lusnia
Chairperson
Easthampton School Committee
50 Payson Avenue
Easthampton, MA 01027

Re:  Easthampton High School

Dear Chair Lusnia:

The Massachusetts Attorney General's Office ("AGO") has concluded its investigation into allegations of civil rights violations at Easthampton High School ("EHS"). The enclosed Memorandum of Agreement includes commitments by the Easthampton Public School District ("EPSD") to implement reforms and programming to address the serious problems identified through the investigation.

I.   Background

EHS serves students in grades nine through twelve and is the only public high school in the district. While most of EHS's students live in Easthampton, the school also has a number of students from nearby communities. For the 2016-2017 school year, EHS reported an enrollment of 471 students.

EHS has experienced a significant demographic shift in its student population over the last decade. The combined black and Hispanic population has nearly tripled to approximately 15% of the student body, while the white population has fallen from roughly 90% to 80% of the student body. As of the 2016-2017 school year, nearly all EPSD staff were white.

The AGO began receiving complaints about EHS in late March 2017. Parents, community members, and civil rights advocates alleged, among other issues, that EPSD and EHS had not properly handled a number of bias-related incidents; that a racially hostile environment existed at the school; and that students of color were subject to disparate discipline and other discriminatory treatment.

1

These initial complaints to the AGO were prompted by a "physical altercation"[1] involving a white student and three students of color that took place on March 29, 2017 ("the altercation"). Complainants indicated that the altercation represented a breaking point at EHS that was the result of serious underlying problems at the school. The altercation occurred after the white student involved sent a series of racist Snapchat messages to a former EHS student. The messages were posted on Facebook and viewed by a number of EHS students. On March 29, the three students of color confronted the white student in the EHS parking lot after school. The altercation was witnessed by a crowd of EHS students, several of whom recorded it on their cell phones. The altercation lasted a little more than two minutes: the students briefly exchanged words before each of the students of color punched the white student; the students then continued their exchange of words, at which point one of the students of color punched the white student a second time; and then the students continued to talk before walking away.

EHS disciplined the three students of color for their involvement in the altercation. EHS also recommended to the Easthampton Police Department that the students of color be criminally charged for their conduct. The students were subsequently arrested and prosecuted. Two of the students are juveniles. Their cases have been resolved. The third student was charged as an adult. Through an agreement with the Northwestern District Attorney's office, he received pre-trial diversion involving a restorative justice program.

The day after the altercation, students organized a walk-out to draw attention to racial tensions and other problems with the school environment. Over the next several weeks, students, parents, and community members expressed concerns about EHS's response to the altercation and other alleged incidents involving serious bias-related conduct. Then, on April 24, a white student flew a confederate flag from his vehicle in the EHS parking lot. The next week, on May 3, another white student began wearing a confederate flag sweatshirt to school. On May 9, the Easthampton School Committee temporarily banned displays of the confederate flag at all EPSD schools.[2] On May 10, a group of students created an Instagram account called "Make.EHS.Great.Again," which was followed a few days later by a second account called "Make.EHS.Great.Again.Part2." The accounts featured a number of disturbing images of the confederate flag, weapons, the EHS building, and EHS students and staff.

II.   Investigative Approach

The AGO began a civil rights investigation into the situation at EHS at the end of March 2017. We investigated both the specific complaints reported to our office as well as additional incidents and issues that were subsequently brought to our attention. We interviewed dozens of people, including EPSD and EHS officials and administrators, faculty, staff, parents, students, alumni, community members, and former EPSD and EHS employees. We reviewed hundreds of pages of documents provided to us by EPSD and the Easthampton Police Department, as well as data from the Department of Elementary and Secondary Education. We also had access to the

---

[1] This is the term EHS used to describe the incident in its internal records. We have adopted the term for the purposes of this investigation.

[2] The ban exempted academic use of the flag.

records of an internal investigation directed by EPSD and a report on the school environment at EHS commissioned by EPSD from the Collaborative on Educational Services ("CES Report").

EPSD and EHS cooperated with our investigation. EPSD officials and EHS administrators provided our office with a large number of documents, facilitated the interview process, and promptly responded to our inquiries and requests for information. Further, to their credit, EPSD and EHS took several positive steps to address problems with the school environment following the altercation. These steps included convening an all-school assembly, commissioning the CES report, and planning programs and trainings on relevant topics for administrators, faculty, staff, students, and parents. EPSD has indicated that it understands the concerns identified by our investigation and has demonstrated a commitment to addressing the significant issues it faces by agreeing to the enclosed Memorandum of Agreement.

### III. Legal Framework

State law prohibits public schools from discriminating against students "on account of race, color, sex, gender identity, religion, national origin or sexual orientation." G. L. c. 76, § 5.[3] A school violates the law if it intentionally discriminates against a student; if it enforces policies that have a disparate impact on students in protected categories; or if it creates, accepts, tolerates, or otherwise fails to respond to, investigate, and eliminate, a hostile environment. A hostile environment exists when bias-related conduct interferes with a student's ability to participate in, or benefit from, school services, activities, and programs. Schools are responsible for responding to and mitigating the effects of bias-related conduct about which they have actual or constructive notice.

### IV. Investigation Summary

Our investigation revealed a number of significant concerns that require immediate attention. We found that EHS was too slow to identify, investigate, and respond to serious bias-related problems with the school environment. We also found significant racial and ethnic disparities in EHS's administration of student discipline.

#### A. School Environment

During the course of the 2016-2017 school year, bias-related incidents led to serious disruptions at EHS and created a hostile environment for many students, particularly students of color.[4] The situation worsened significantly following the altercation. The low point of the year came after white students began displaying the confederate flag in April. Most students interviewed reported viewing the flag as an intimidating, racist symbol. By May, students indicated that they felt unwelcome, anxious, intimidated, and unable to concentrate on academics

---

[3] Federal law similarly prohibits discrimination on the base of race, color, religion, sex, or national origin by public elementary and secondary schools, 42 U.S.C. § 2000c-6, and discrimination on the basis of race, color, or national origin in any program or activity that receives federal financial assistance, 42 U.S.C. § 2000d. In addition, our state and federal constitutions guarantee all students' rights to due process and equal protection.

[4] The CES report indicated that a significant number of EHS students felt physically or emotionally unsafe at school by the end of 2016-2017. Again, this finding is consistent with the results of our investigation.

3

or other school activities. Multiple students reported feeling that they no longer wanted to go to school.

This section provides an overview of our concerns about the manner in which EPSD and EHS handled bias-related problems with the school environment. It does not provide a catalogue of every bias-related incident identified by our investigation, many of which could compromise student privacy if discussed in detail. We found that EPSD and EHS could have, and should have, identified and responded to bias-related issues before the altercation. An earlier, more forceful response could have prevented both the altercation and the escalating disruptions that followed. We also identified continuing problems with the way EPSD and EHS handled complaints about bias-related incidents after March 29.

1. Bias-Related Problems With the School Environment

EHS has had a serious and ongoing problem with students engaging in racist and other bias-related conduct. This problem did not begin during the 2016-2017 school year. Students reported serious bias-related incidents dating back several years. Students of color, in particular, identified racial tension as a long-term problem that became worse during the last school year.[5]

Our investigation revealed that students routinely experience and witness bias-related conduct at school.[6] Students reported that white students regularly make mocking, hostile, or otherwise inappropriate comments and jokes about the actual or perceived race, ethnicity, and/or religion of minority students. This behavior includes the use of racial and ethnic slurs. We also found that white students have been involved in acts of intimidation and threats of violence that involved explicitly racist language and slurs. Our investigation indicated that while bias-related comments were a relatively widespread problem at EHS, a small number of white students were responsible for a majority of the other bias-related conduct at the school in recent years.

2. Missed Opportunities to Address Bias-Related Problems With the School Environment

EPSD and EHS were not prepared to deal with the difficult challenges they faced during the 2016-2017 school year. In recent years, EPSD and EHS paid inadequate attention to the increasing diversity and racial climate at the school. EPSD and EHS did not implement any meaningful programs, policies, or trainings to address issues related to bias, discrimination, or cultural sensitivity. We found that EPSD and EHS officials' understanding and perception of the school environment was primarily informed by their personal experiences and that students of color frequently had different experiences and perceptions of EHS, particularly concerning the racial climate at the school. This disconnect made it more difficult for EPSD and EHS to

---

[5] We found that students frequently did not report bias-related incidents prior to the altercation. Students of color explained that they often did not report these incidents because of a lack of responsiveness and understanding from faculty and staff when they had previously raised concerns.

[6] The CES Report found that significant numbers of students experienced or witnessed bias-related conduct on a daily or weekly basis. This finding is consistent with the results of our investigation.

4

identify underlying racial tensions and to effectively respond to complaints and incidents involving bias-related conduct.

EPSD and EHS misinterpreted or ignored serious warning signs leading up to the altercation. EHS had notice of a significant and increasing number of bias-related incidents during the first part of the 2016-2017 school year.[7] Between September 2016 and March 2017, there were at least six documented incidents that involved students using racist slurs, students expressing unambiguously racist or otherwise bigoted opinions, or other bias indicators. Most, if not all, of these incidents were witnessed by other students who were offended or disturbed by the conduct involved.

In addition to events at school, EPSD and EHS were aware of significant tensions in the surrounding community. Between September 2016 and March 2017, rocks at the top of Mt. Tom were repeatedly painted with racist graffiti; Easthampton went through a contentious debate over becoming a "sanctuary city," during which some community members publicly expressed racist and otherwise bigoted opinions; and dozens of pro-diversity "Good Neighbor" and "Black Lives Matter" lawn signs were stolen from residents' homes and destroyed. EPSD and EHS acknowledged that these tensions in the community impacted the school environment. In at least one case, the impact was direct and immediate: in the fall of 2016 during the run up to the presidential election, an adult resident came onto EHS grounds and made racist and threatening comments to a student of color.

### 3. Problems Following the March 29 Altercation

EPSD and EHS continued to mishandle bias-related issues after the altercation. Just a few days later, EHS failed to react properly or effectively to a complaint from a student of color about the racial climate at the school, including the use of racial slurs by students. EHS reacted defensively to the complaint, chastised the student, and did not conduct an appropriate investigation. EHS's response upset the student involved and alienated other students who learned about it. EHS's actions and inactions unnecessarily exacerbated existing tensions at the school.

More than a month later, in early May, EHS failed to adequately investigate and respond to the Instagram account called "Make.EHS.Great.Again."[8] EPSD and EHS began receiving complaints about the page on May 10, shortly after it was created. EHS properly reported the page to the police and took steps to have it taken down. However, after the student(s) responsible for administering the page agreed to take it down, EHS did not conduct a follow-up investigation or take appropriate disciplinary action.[9] EHS did not review the comments associated with the page, attempt to determine whether it had been shared with other students, or examine what impact it had on the school environment.

---

[7] As indicated above, there were bias-related incidents at EHS prior to 2016-2017. For example, during the 2015-2016 school year, EHS received a bomb threat that included a number of violent statements above a swastika. The frequency of documented incidents, however, increased significantly during 2016-2017.

[8] This incident occurred after EHS and EPSD were notified of the AGO's investigation.

[9] The failure to take disciplinary action was particularly problematic given that the student(s) involved posted to the page from EHS using a Wi-Fi password they had apparently taken from a staff member.

We found that the student(s) responsible for "Make.EHS.Great.Again" took affirmative steps to share the page with other EHS students, including students who had publicly expressed that they considered the confederate flag to be a racist symbol. Among other actions, the student(s) used the account to "follow" other EHS students, including students of color, on Instagram. Students who were followed by "Make.EHS.Great.Again" received a notification on their cell phones that featured a profile picture of the confederate flag.

EHS's failure to forcefully respond to "Make.EHS.Great.Again" encouraged further acts of harassment. Immediately after the page was taken down, a second page, "Make.EHS.Great.Again.Part2," was created. This page included material from the first page, plus additional, more disturbing images. On May 17, a confederate flag sticker was placed on another student's car in the EHS parking lot and pictures of it were distributed on social media.[10]

### B. School Discipline

Our investigation revealed substantial racial and ethnic disparities in how student discipline has been administered at EHS. EHS administrators and staff have not been provided with sufficient training on how to implement disciplinary policies in a consistent, fair, and equitable manner.

Discipline at EHS is nominally governed by the Student Handbook. However, the Student Handbook provides only loose guidelines. Disciplinary decisions are primarily left to the discretion of the assistant principal and principal. There are no formal systems in place at EHS to ensure that disciplinary decisions are made in a fair and equitable manner. There is no staff member or official at the school or district level with responsibility for reviewing disciplinary policy and actions. EHS administrators reported that they have not received any significant training through EPSD on bias or discrimination in discipline. Although EHS has made significant changes to its disciplinary policies and strategies in recent years, it has not given serious consideration to issues of racial/ethnic equity.

EHS disciplines black and Latino/Hispanic (hereafter "Hispanic") students at significantly disproportionate rates. This problem has been particularly pronounced for the types of incidents over which administrators generally have the most discretionary authority ("discretionary infractions"). For these types of discretionary infractions, we found that between the 2012-2013 and 2015-2016 school years,[11] black students were disciplined at approximately four times the rate of white students, and Hispanic students were disciplined at approximately three times the rate of white students. These disparities have been a constant issue despite the fact EHS made significant changes to its disciplinary policies between 2012 and 2016. During the 2014-2015 school year, EHS began implementing new policies focused on progressive

---

[10] To their credit, EHS identified and disciplined the student(s) responsible for "Make.EHS.Great.Again.Part2" and the confederate flag sticker incident. We are unaware of any significant incidents at EHS after this disciplinary action was taken.

[11] The most recent school year for which we received complete, aggregate-level disciplinary data was 2015-2016.

discipline; these policies were significantly expanded and supplemented by a commitment to restorative justice in the 2015-2016 school year. The policy changes led to a marked reduction in most disciplinary measures. However, the racial/ethnic disparities persisted.

The hundreds of pages of incident-level data we reviewed did not provide a satisfactory explanation for these aggregate-level discrepancies and gave rise to additional concerns.[12] We found no evidence that racial/ethnic disparities in discipline at EHS are due to more frequent or severe behavior by students of color. The records suggest that black and Hispanic students have been disciplined more severely than other students for engaging in similar types of conduct. In particular, black and Hispanic students have been suspended at significantly higher rates after controlling for infraction type.

EHS's disciplinary records include other troubling patterns. First, the school has treated physical incidents involving white students less severely than incidents involving students of color. Every incident we were able to identify where a black or Hispanic student laid hands on another student resulted in a suspension. However, we identified several physical incidents involving white students that resulted in less severe discipline. Second, EHS has considered explanatory and mitigating factors before imposing discipline in a significantly lower percentage of incidents involving black and Hispanic students than incidents involving other students. Finally, EHS has classified a much lower percentage of incidents involving black and Hispanic students with the descriptor "Other"[13] relative to incidents involving other students. EHS appears to have used "Other," rather than a specific Incident Type (e.g. "Assault"), to indicate that an infraction was complicated and required a special disciplinary response. Overall, incidents classified as "Other" resulted in less severe discipline—particularly for white students—than similar incidents classified using a specific Incident Type.

Against this background, we identified several concerns with EHS's disciplinary response to the altercation. Several of these concerns involve aspects of EHS's internal disciplinary process that implicate student privacy.[14] We have communicated those concerns to EPSD and EHS and will not discuss them further in this letter. In addition, we identified a procedural concern with EHS's decision to recommend criminal charges against the students of color involved in the altercation. We consider this action to be a component of school discipline. Of course, EHS does not control how the police and District Attorney's office proceed with criminal investigations and prosecutions. However, school officials can, and often do, play an important role in the process. We found that EPSD does not have sufficient guidelines or policies in place to assist administrators in their interactions with the police or to ensure that decisions concerning potentially criminal conduct are made in a fair, appropriate, and consistent manner. No EHS administrator witnessed the altercation, and EHS did not acquire video of the

---

[12] In addition to the issues discussed below, we identified substantial problems with the way disciplinary incidents in general were recorded, classified, evaluated, and resolved both within and across academic years. This issue was only partially attributable to the recent changes in disciplinary policy. These problems complicated the process of determining whether discipline had been equitably applied across racial and ethnic groups.

[13] EHS's disciplinary record keeping system includes a field for "Incident Type," e.g. Truancy, Profanity, Physical Fight, Insubordination, Cut Detention, Assault, Bullying, etc.

[14] Among other issues, EHS took additional disciplinary action against another student in connection with the altercation. This discipline was vacated in response to significant concerns identified through our investigation.

7

incident, or conduct an appropriate investigation, prior to becoming involved in discussions with the police about criminal charges.

V. Conclusion

The serious concerns identified through our investigation indicate that EPSD and EHS need to comprehensively review and systematically change the manner in which they handle issues related to diversity, discipline, and bias-related conduct. To their credit, EPSD and EHS have already begun this process on their own initiative. EPSD and EHS's willingness to confront these issues significantly influenced the AGO's approach to this matter. We are confident that, in compliance with our agreement, EPSD and EHS will take the steps necessary to eliminate racial and ethnic disparities in discipline and foster a school environment that is positive, welcoming, and inclusive for all students.

With the signing of the enclosed Memorandum of Agreement, the AGO is closing this investigation.

Sincerely,

Jon Burke
Assistant Attorney General
Civil Rights Division

cc: Russell Dupere, Esq. (w/ copy of enclosure)

## Memorandum of Agreement

### I. Introduction

The Easthampton Public School District ("EPSD") and the Office of the Attorney General of Massachusetts ("AGO") voluntarily enter into this memorandum of agreement ("Agreement") to improve Easthampton High School's ability to ensure equitable discipline and to prevent and respond to peer-on-peer bullying and harassment based on race, color, ethnicity, national origin, immigration status, religion, sex, sexual orientation, gender identity, and disability, characteristics that are protected by state and federal civil rights laws, including G. L. c. 76, § 5, and G. L. c. 71, § 37O. These laws prohibit, among other things, discrimination against students by and in public elementary and secondary schools.

### II. Background

The AGO initiated a civil rights investigation concerning Easthampton High School ("EHS") in March 2017 after receiving complaints from parents, community members, and civil rights advocates that EPSD and EHS had not properly handled a number of bias-related incidents; that a racially hostile environment existed at the school; and that students of color were subject to disparate discipline and other discriminatory treatment. As part of its investigation of these complaints, the AGO interviewed dozens of people, including EPSD and EHS officials and administrators, faculty, staff, parents, students, alumni, community members, and former EPSD and EHS employees. The AGO also reviewed hundreds of pages of documents provided by EPSD and the Easthampton Police Department, as well as data from the Department of Elementary and Secondary Education.

EPSD cooperated fully with the AGO's investigation by, among other things, producing a large number of documents, facilitating interviews, and responding to AGO inquiries. Additionally, after March 29, 2017, EPSD began to take proactive steps to address the environment at EHS, including convening an all-school meeting to discuss the climate at EHS, commissioning a climate survey of EHS by the Collaborative for Educational Services, and planning to provide additional training on relevant topics to administrators, faculty, and staff. EPSD intends to further demonstrate its commitment to addressing the AGO's concerns regarding EHS by entering into this Agreement.

EPSD voluntarily enters into this Agreement to create a framework that will ensure that EHS is a safe and inclusive environment for all students. By entering into this Agreement, EPSD does not admit any violation of state or federal law. Nothing contained in this Agreement shall be considered, construed, or used as an admission of legal liability by EPSD or EHS.

### III. Definitions

1. The terms "bullying" and "hostile environment" shall have the meanings set forth in G. L. c. 71, § 37O.

1

2. "Harassment" includes the use of derogatory language (including racial epithets) and/or images in graffiti, pictures or drawings, notes, e-mails, electronic postings, and/or phone messages because of a person's protected characteristics; intimidation and threats; and unwanted physical contact or physical violence. Harassment does not have to be motivated by an intent to harm, be directed at a specific target, or involve repeated incidents.

3. "Bias indicators" include the criteria listed in 501 C.M.R. 4.04.

4. "Protected characteristics" include race, color, ethnicity, national origin, immigration status, religion, sex, sexual orientation, gender identity, and disability.

5. "Racial climate" shall refer generally to the objective and subjective perceptions and experiences of students at EHS with regard to issues of race and ethnicity, and includes, among other things, concerns of racial bullying and harassment and the fair and consistent (or lack thereof) application of discipline.

## IV. Requirements

EPSD agrees to take proactive measures to promote a climate at EHS that is positive, welcoming, and inclusive of all students, including by communicating to administrators, faculty, and staff their responsibilities in creating and supporting positive classroom and extracurricular environments, and providing them with sufficient training, guidance, and support to carry out those responsibilities. Specifically:

1. Harassment Policies and Procedures. EPSD shall develop and/or update policies and procedures regarding the identification, reporting, investigation, and institutional response to harassment. Such policies and procedures shall specifically address harassment that implicates one or more protected characteristics. Such policies and procedures must be approved by the AGO.

2. Diversity & Inclusion Officer. EPSD shall appoint a qualified Diversity & Inclusion Officer at EHS who shall be responsible for: (a) monitoring all complaints of bullying and harassment based on protected characteristics, as well as any other incidents involving bias indicators; (b) advocating on behalf of the students who make such complaints; and (c) fostering an environment of inclusion and respect at EHS, including by making recommendations on improving the racial climate at the school. The Diversity & Inclusion Officer shall give input into EHS's policies and procedures, including those addressing student discipline, and shall attend and participate in all student, parent, and staff training programs described herein. The Diversity & Inclusion Officer shall report to the Superintendent of EPSD.

3. Programming for Students. Beginning in September 2017 and continuing through the 2020-2021 academic year, EHS shall implement mandatory, ongoing, and interactive programming for students on preventing and addressing bullying and harassment based on protected characteristics, and on EHS's policies and procedures for reporting and responding to such conduct. EHS shall pay the cost of such programming. The programming must be pre-approved by the AGO, and must include, at a minimum, the following:

2

  a. Instruction on the types of conduct that constitute bullying and harassment based on protected characteristics, including off-campus conduct and the use of social media;

  b. Instruction on the negative impact that bullying and harassment based on protected characteristics have on the educational environment;

  c. Information regarding how students should respond to bullying and harassment that they experience or witness, including the reporting avenues available;

  d. Information regarding how faculty, administrators, and staff are expected to respond to bullying and harassment that they witness or that is reported to them;

  e. EHS's disciplinary procedures and consequences for bullying and harassment; and

  f. Instruction designed to promote an inclusive and safe educational environment for all students.

4. *Programming for Parents*. Beginning in September 2017 and continuing through the 2020-2021 academic year, EHS shall make available to parents/guardians of students attending EHS an annual training program on the measures EHS has undertaken (or is undertaking) to improve the environment at EHS, including information on how to report bullying and harassment, and information on EHS's policies and procedures for investigating and responding to reports of such conduct. The program must be pre-approved by the AGO and shall be made available to parents/guardians in their primary language.

5. *Training and Professional Development for EHS Staff*. Beginning in September 2017 and continuing through the 2020-2021 academic year, EHS shall implement ongoing, interactive, and mandatory training programming for all administrators, faculty, and other staff, on improving EHS's racial climate, including preventing and addressing bullying and harassment based on protected characteristics, and ensuring the fair and consistent application and documentation of student discipline. EHS shall pay the cost of such programming. The programming must be pre-approved by the AGO, and must include, at a minimum, the following:

  a. Instruction on the types of conduct that constitute bullying and harassment based on protected characteristics and the negative impact that such conduct can have on students and the educational environment;

  b. Guidance on EHS's commitment and responsibility to foster a nondiscriminatory and inclusive educational environment for all students;

3

    c.    A facilitated discussion on implicit/unconscious bias and the effect it can have on perceptions of reports of bullying and harassment based on protected characteristics as well as on disciplinary determinations; and

    d.    A review of EHS's applicable policies and procedures, including EHS's Code of Conduct, with an emphasis on the duty of EHS and its administrators, faculty, and staff to:

        (i).    report all incidents of bullying and harassment based on protected characteristics that they witness, or become aware of, to EHS's designated Diversity & Inclusion Officer;

        (ii).    respond promptly and appropriately to all bullying and harassment based on protected characteristics; and

        (iii).    take effective action to end bullying and harassment based on protected characteristics, prevent its recurrence, and, as appropriate, remedy its effects.

In addition to the training outlined above, training for administrators, faculty, and staff with any responsibility for student discipline shall specifically include:

    a.    Instruction on EHS's Code of Conduct and its application, including any measures on progressive discipline and restorative justice;

    b.    Instruction on consistent application of disciplinary procedures and informal interventions or dispute resolutions to ensure that all EHS students are treated equitably and fairly;

    c.    Instruction on consistent documentation of disciplinary procedures, including how, where, and when disciplinary procedures are recorded;

    d.    A discussion of discrimination in student discipline; and

    e.    A discussion of how unconscious bias might impact student discipline.

    6.    <u>Make-up Training/Programming</u>. EPSD shall ensure that any EHS administrator, faculty, or staff member who misses a scheduled training receives a substantially equivalent make-up training in a timely manner.

    7.    <u>Record Keeping</u>. EPSD shall improve its documentation of student discipline, including by developing guidelines for, and providing training to implement, a more uniform process for recording, tracking, and reporting on student discipline. These guidelines shall specifically address how to categorize incidents; the documentation of considerations such as mitigating circumstances, progressive discipline, and the application of restorative justice

4

principles; and the coding of incidents to indicate whether they involve a bias indicator or bullying or harassment based on protected characteristics.

8. Discipline Audits. No later than December 31st of each year from 2017 through 2020, EPSD agrees to retain a qualified third-party consultant, mutually agreed upon by EPSD and the AGO, to audit EHS's disciplinary records upon the conclusion of each of the school years from 2017-2018 through 2020-2021. The audit shall be concluded by the July 31st following the school year being audited. While a qualified third-party consultant must conduct the audit, EPSD data analysts may compile the necessary data and documents for the third-party consultant's review. The audit shall address the following: (a) the adequacy of EHS's disciplinary records; (b) whether disciplinary data and/or other records reflect disparities in discipline based on protected characteristics, including, among other things, whether black and/or Hispanic students are being disciplined at disproportionate rates, and whether students of different races or ethnicities are receiving more or less severe discipline for substantially similar conduct; and (c) whether EHS is adequately identifying, investigating, and responding to bullying and harassment based on protected characteristics. The audit should also consider whether EHS is effectively implementing its goals of progressive discipline and restorative justice in disciplining its students.

9. Police Involvement at EHS. EPSD shall develop policies and procedures regarding when and how law enforcement will be involved in, or notified of, incidents that occur at EHS, including when parents will be notified of police involvement, and under what circumstances EHS and/or EPSD will give input into whether criminal charges should be filed against an EHS student. Such policies and procedures must be approved by the AGO.

10. School Resource Officer: If EPSD continues to have a dedicated School Resource Officer ("SRO"), it shall do so pursuant to a written agreement with the Easthampton Police Department that complies with applicable state and federal law and is approved by the AGO. The agreement shall state that, among other selection factors and subject to resource constraints, there should be a preference for the assignment of an SRO who is not related to any current EPSD student. In addition, any appointed SRO who is related to a current EPSD student, or who has another actual or apparent conflict of interest based on a relationship with any EPSD student(s) or staff member(s) (e.g., an SRO who also serves as a coach or advisor at EHS), shall be required to notify his/her direct superior at the earliest opportunity if/when any non-emergency issue or incident arises that implicates that actual or apparent conflict of interest. The Easthampton Police Department will determine the appropriate course of action, including whether to assign another officer to respond, and will advise the SRO and EPSD accordingly. Nothing in this paragraph is intended to limit the ability of the SRO to respond to emergency situations at EPSD schools. All SROs assigned to EPSD must receive training on discrimination, bias indicators, unconscious bias, progressive discipline, and restorative justice efforts at EPSD.

11. Reporting. Each July in the years 2018 through 2021, EPSD shall provide an annual written report to the AGO that includes:

5

   a. An overview of the racial climate at EHS, as well as efforts by EHS and/or EPSD to address any concerns identified in the discipline audit referenced herein and by the Diversity & Inclusion Officer;

   b. Copies of all complaints, investigation reports, and documents reflecting EHS's resolution and response to all reports of bullying and harassment based on protected characteristics of or by students or staff at EHS;

   c. Documentation of discipline imposed in connection with bullying and harassment based on protected characteristics of or by EHS's students or staff; and

   d. A copy of the results of the discipline audit referenced herein.

V. Additional Provisions

1. Compliance. EPSD shall comply with state and federal civil rights and education laws. Upon receipt of a request from the Attorney General or her representatives, EPSD shall produce all non-privileged documents or other information relating to its compliance with the provisions of this Agreement.

2. Enforceability. If any part of this Agreement is for any reason held to be invalid, unlawful, or otherwise unenforceable by a court of competent jurisdiction, such decision shall not affect the validity of any other part of the Agreement.

3. Third-Party Right of Action/Enforcement. This Agreement is not intended to impair any right of action that any person or entity, other than the Attorney General, might have against EPSD. Nor shall this Agreement be enforceable by third parties or construed to create third-party beneficiary rights.

4. Breach. EPSD understands and acknowledges that a breach by EPSD of this Agreement shall constitute noncompliance pursuant to G. L. c. 69, § 1B, and that the AGO may take all appropriate action to obtain compliance, including, but not limited to, civil enforcement in a court of competent jurisdiction. The AGO agrees, however, to make a good faith effort to meet and confer with EPSD to obtain compliance before pursing further enforcement action.

5. Applicable Law. The provisions of this Agreement shall be construed in accordance with the laws of the Commonwealth of Massachusetts.

6. Complete Agreement. This Agreement contains the complete agreement between the Commonwealth and EPSD. No promises, representations, or warranties other than those set forth in this Agreement have been made between the Commonwealth and EPSD. This Agreement supersedes all prior communications, discussions, or understandings, if any, between the Commonwealth and EPSD, whether oral or in writing.

7. <u>Modification</u>. This Agreement may not be changed, altered, or modified, except by further order of the Court or by written consent of the parties.

8. <u>Effective Date</u>. This Agreement becomes effective upon execution.

9. <u>Other Laws</u>. It is the intention of the parties that the provisions of this Agreement do not contravene EPSD's obligations or requirements pursuant to G. L. c. 71, § 370 and G. L. c. 76, § 5.

SO AGREED.

| *For the Office of the Attorney General* | *For Easthampton Public School District* |
|---|---|
| *[signature]* | *[signature]* |
| Genevieve C. Nadeau | Nancy Follansbee |
| Chief, Civil Rights Division | Superintendent |
| One Ashburton Place | Easthampton Public School District |
| Boston, MA 02108 | 50 Payson Avenue |
| | Easthampton, 01027 |
| Date: 8/25/17 | Date: 8/24/2017 |

7